**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| **MARIA GALARZA,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 16-0764 (ES)** |
| | : | |
| **v.** | : | **OPINION** |
| | : | |
| **ROZLYN WHITTLE-KINARD, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

SALAS, DISTRICT JUDGE

This action involves alleged violations of the New Jersey Law Against Discrimination (the "LAD"), the Family Medical Leave Act (the "FMLA"), the Fair Labor Standards Act (the "FLSA"), and the New Jersey Wage and Hour Law (the "NJWHL"). Plaintiff Maria Galarza ("Plaintiff" or "Galarza") sued certain individuals associated with Saint Michael's Medical Center, Inc. ("St. Michael's"), as well as Prime Healthcare Services – St. Michael's, LLC ("Prime" or "Prime-St. Michael's"). Galarza alleges that Prime is liable under theories of the joint-employer doctrine and successor liability. Prime, however, has moved to dismiss all claims against it under Federal Rule of Civil Procedure 12(b)(6). (D.E. No. 36).

Having considered the submissions made in support of and in opposition to Prime's motion, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b). For the reasons below, the Court DENIES Prime's motion to dismiss.

I.    **Factual & Procedural Background**[1]

    A.  **Galarza's Medical Leaves at Saint Michael's Medical Center, Inc.**

In 1990, Galarza began working for St. Michael's.  (D.E. No. 30 ("Compl.") ¶¶ 1, 8).  For medical issues, Galarza—who worked in a certain St. Michael's laboratory—took leave as follows:

- From on or around October 25, 2013 "for approximately four weeks until November 2013," she had a "surgery for arterial repairs to her pelvis" (*id.* ¶¶ 13-14) (the "October-November 2013 leave");

- From on or around March 18, 2014 to April 25, 2014, she was "on medical leave for four weeks" stemming from injuries when she "fell out of her chair" on or around March 13, 2014 at work (*id.* ¶¶ 22-24) (the "March-April 2014 leave");

- From on or around June 19, 2014 to July 2014, she "went out of work for four weeks to undergo surgery for pelvic adhesions" (*id.* ¶¶ 27-28) (the "June-July 2014 leave");

- From August 11, 2014 to December 21, 2014, she was "out of work" relating to a "rotator cuff surgery" that "was required as a result of a workplace injury" (*id.* ¶¶ 32-33, 36) (the "August-December 2014 leave");

As follows, Galarza alleges that she faced embarrassment and/or some unfavorable consequence for each leave.

For the October-November 2013 leave, Galarza was not present for new equipment training, and Galarza's former direct supervisor, Defendant Lota Herrera, averred  (among other things) that "the whole process" regarding the new piece of equipment "was delayed" because of her leave.  (*See id.* ¶¶ 3, 11, 15-19).  Further, Galarza alleges that the representative of the lab-equipment company was aware of her "personal medical information."  (*See id.* ¶¶ 17-21).

The day she returned from the March-April 2014 leave, Herrera said to Galarza (when meeting at an airport to go to an out-of-town meeting): "Oh, you made it?  It seems like you are

---

[1]    The Court must accept Plaintiff's factual allegations as true for purposes of resolving the pending motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012). Additional factual allegations are provided elsewhere in this Opinion as relevant to the Court's analysis.

out all the time." (*See id.* ¶¶ 24-26). When Herrera said this, "she was aware that [Galarza] was returning on that day." (*Id.* ¶ 26).

After the June-July 2014 leave, Herrera told Galarza that "other employees were giving Herrera a hard time" and that she "got in trouble" because Galarza was on leave. (*Id.* ¶¶ 28-29). Galarza alleges that Herrera "was in fact reprimanded," but because she "failed to get her job done" and "not because of anything having to do with [Galarza] taking leave." (*Id.* ¶ 30).

Before the August-December 2014 leave, Herrera questioned Galarza as to whether she would be having more surgery and was going to be "out of work again." (*Id.* ¶ 34). Further, Defendant Rozlyn Whittle-Kinard—one of Galarza's supervisors—asked whether she could postpone her surgery. (*See id.* ¶¶ 2, 35). And, during one of Galarza's "regular updates" to Herrera regarding her medical condition, "Herrera commented to [P]laintiff that maybe [P]laintiff should not come back at all since she is out of work all the time." (*Id.* ¶¶ 37, 39). Galarza told Herrera that she was going to report this comment and, in fact, she reported it to Whittle-Kinard—who "did not take any action regarding [her] complaint of harassment." (*Id.* ¶¶ 41-42).

Also, while Galarza was learning how to operate new equipment installed after the August-December 2014 leave, Herrera averred that Galarza was struggling because of her leave. (*See id.* ¶¶ 44-46). During a meeting "[i]n or around February 2015," Whittle-Kinard "criticized" Galarza for failing to operate the new equipment. (*Id.* ¶¶ 47-48). Present in that meeting were Herrera and a representative of the lab-equipment company. (*Id.*). Further, Whittle-Kinard and Herrera made additional comments concerning her purported inability to operate the new equipment, some of which "embarrassed" Galarza. (*See id.* ¶¶ 49-53, 56-57, 60-63).

Later in spring 2015, Galarza was reassigned to a different laboratory.  (*See id.* ¶¶ 64-66).  But Galarza told Whittle-Kinard that she couldn't work in that laboratory because of her "pelvic medical condition and lower back problems."  (*Id.* ¶ 67).  Thereafter, Whittle-Kinard declined to continue this discussion after learning that Galarza had a doctor's appointment that would interfere with a meeting with Human Resources (which concerned overtime pay).  (*See id.* ¶¶ 68-71).  Galarza returned from medical leave to work on or around October 13, 2015.  (*Id.* ¶ 75).  Some time thereafter, however, Whittle-Kinard told Galarza that "her position was being eliminated immediately."  (*See id.* ¶¶ 76-81).

**B.  Galarza's State-Court Lawsuit & This Action**

On July 23, 2015, Galarza sued St. Michael's in New Jersey state court, alleging violations of the FMLA, the FLSA, the LAD, and the NJWHL.  (*See id.* ¶¶ 72-73).  On August 12, 2015, the complaint was served on St. Michael's.  (*Id.* ¶ 74).  On that same day, St. Michael's advised Galarza that, on August 10, 2015, St. Michael's filed for Chapter 11 bankruptcy.  (*Id.* ¶ 74a).[2]  But St. Michael's continued to operate.  (*Id.* ¶ 74b).

On December 14, 2015, Galarza sued certain individuals from St. Michael's (including Whittle-Kinard and Herrera) in New Jersey state court.  (*See* D.E. No. 1-1).  That action was removed to this Court and constitutes the instant civil action.  Thereafter, Galarza amended her complaint to add Prime.  (D.E. No. 12).  The parties thereafter stipulated to permit Galarza to file a second amended complaint—which is the subject of Prime's motion to dismiss.  (*See* D.E. Nos. 29 & 30).

---

[2]      Prime states that the state court dismissed this action *without prejudice* after St. Michael's filed for bankruptcy.  (D.E. No. 36-1 at 1).  Galarza states that St. Michael's "sent a letter to the court requesting the case be placed on administrative hold because [St. Michael's] filed for Chapter 11 Bankruptcy on August 10, 2015."  (D.E. No. 41 at 2).

Galarza alleges that, despite St. Michael's bankruptcy filing, "the facility continued to operate," and Prime "continued to operate the facility by itself or in conjunction with St. Mary's [sic] in 2015 and continues to today." (Compl. ¶¶ 74b-74c; *see also id.* ¶¶ 109l-109p (allegations concerning Prime's control over operating St. Michael's before and at the time of Galarza's termination, as well as Prime's management responsibilities during this time period)). She alleges that, in May 2016, Prime "finalized its merger with or purchase of St. Michael's." (*Id.* ¶ 109a). Prime uses: "the same facility at the same address that St. Michael's used" (*id.* ¶ 109d); "substantially the same workforce that St. Michael's used" (*id.* ¶ 109e)[3]; "the same or substantially the same supervisory personnel that St. Michael's used" (*id.* ¶ 109f); and "the same machinery, equipment, and methods of services and provides the same services" (*id.* ¶ 109h). Further, "the same jobs exist under substantially the same working conditions." (*Id.* ¶ 109g).

Galarza asserts the following counts against Prime: retaliation in violation of the LAD (Count I) "pursuant to the doctrine of successor liability"; retaliation in violation of the FMLA "pursuant to the doctrine of successor liability" (Count III); violation of the FLSA "pursuant to the doctrine of successor liability" (Count IV); and violation of the NJWHL "pursuant to the doctrine of successor liability" (Count V). (*See id.* ¶¶ 110-132).[4] She also alleges that Prime "was a joint employer of Plaintiff at the time she was terminated from her employment and for a period of time before that." (*Id.* ¶ 109k).

### C. St. Michael's Bankruptcy Proceedings

On November 13, 2015, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") issued an order that, among other things, approved the sale of

---

[3]    Prime is a corporation registered in New Jersey operating since June 28, 2013 at 111 Central Avenue, Newark, New Jersey 07102 (its principle place of business). (Compl. ¶¶ 6a-6b).

[4]    Count II of the Complaint is "Aiding and Abetting" against certain individual defendants who have separately answered, and Count VI is a "Request for Equitable Relief" relating to all of the Defendants. (*See* D.E. No. 35).

the facility in which Galarza worked to Prime.  *See In re Saint Michael's Medical Center, Inc.*,

No. 15-24999, D.E. No. 383 (Bkr. D.N.J. Nov. 13, 2015) (hereinafter the "Nov. 13 Bankruptcy

Court Order"); (Compl. ¶¶ 1, 6a, 109a, 109d).

In that order, the "Debtors" include St. Michael's.  (Nov. 13 Bankruptcy Court Order at 1

n.1).  The "Purchaser" is Prime.  (*Id.* at 3).  Notably, the Bankruptcy Court's November 13 order

provides that:

> The Debtors may sell the Assets to Purchaser free and
> clear of any and all Liens and Claims . . . of any and every kind or nature
> whatsoever (other than the Assumed Obligations) in accordance
> with section 363(f) of the Bankruptcy Code. As a condition of
> purchasing the Assets, Purchaser requires that the Assets be sold
> free and clear of any and all Liens and Claims of any and every
> kind or nature whatsoever (other than the Assumed Obligations).

(*Id.* at 7-8).  The order further provides that:

> Upon the Closing Date and payment of the Purchase Price, all of
> the Debtors' right, title and interest in and to the Assets shall pass
> to Purchaser pursuant to section 363(f) of the Bankruptcy Code
> and all other applicable laws *free and clear of any and all
> liabilities*, Liens, security interests, encumbrances, Claims, proofs
> of claims filed in these cases, reclamation claims, mortgages, deeds
> of trust, pledges, covenants, restrictions, hypothecations, charges,
> indentures, loan agreements, causes of action, instruments, options,
> rights of first refusal, offsets, recoupment, rights of recovery,
> judgements, orders and decrees of any court or foreign or domestic
> governmental entity, claims for reimbursement, contribution,
> indemnity or exoneration, assignment, preferences, debts, charges,
> suits, rights of recovery, interests, products liability, environmental
> claims or liability, *successor liability*, withdrawal liability, claims
> and liabilities for employee pay, benefits or other compensation,
> claims or liabilities under or in connection with collective
> bargaining agreements, taxes, and other liabilities, causes of action
> and claims of any and every kind and nature whatsoever (other
> than the Assumed Obligations), in each case whether secured or
> unsecured, choate or inchoate, filed or unfiled, scheduled or
> unscheduled, noticed or unnoticed, recorded or unrecorded,
> perfected or unperfected, allowed or disallowed, contingent or non-
> contingent, liquidated or unliquidated, matured or unmatured,
> material or non-material, disputed or undisputed, or known or

unknown, *whether arising prior to, on, or subsequent to August 10, 2015* (the 'Petition Date'), whether imposed by agreement, understanding, law, equity or otherwise (collectively, the 'Liens and Claims') . . . .

(*Id.* at 11-12 (emphasis added)).

## II.   Overview of the Parties' Arguments

Prime contends that Galarza's claims against it arise from her employment with an entity that is not a party to this litigation—i.e., St. Michael's.  (D.E. No. 36-1 ("Def. Mov. Br.") at 1).  Prime states that "all claims Plaintiff could possibly assert against Prime Healthcare are barred by the Bankruptcy Code" because, under the Code in the circumstances here, "successor liability claims are not available to a plaintiff."  (*Id.* at 2).  Accordingly, Prime argues that the Bankruptcy Court's November 13 order, pursuant to Bankruptcy Code section 363, precludes any alleged successor liability.  (*See id.* at 15-21).  Prime adds that public policy concerns bar Galarza's attempt to circumvent well-settled bankruptcy law.  (*See id.* at 21-24).  Prime asserts that Galarza "has offered no legitimate basis upon which her successor liability claims can survive dismissal pursuant to Bankruptcy Code Section 363 and the express language of the Bankruptcy Court's [] order."  (D.E. No. 42 ("Def. Reply Br.") at 6).

In opposition, Galarza argues that her termination claims against Prime occurred *after* St. Michael's filed its bankruptcy petition and, because she was terminated after the bankruptcy petition, section 363 may dispose of successor liability only for conduct that arose before the petition or resulted from pre-petition conduct.  (*See* D.E. No. 41 ("Pl. Opp. Br.") at 11-12).  And she counters that public policy supports bringing a claim against Prime under the successor-liability doctrine.  (*Id.* at 12-13).  In particular, Galarza argues that, "[l]ooking at the facts in a light most favorable to Plaintiff, in this matter there is evidence of an 'actual or de facto' consolidation or merger" of St. Michael's and Prime.  (*Id.* at 13).

Prime also argues that Galarza's joint-employer theory of liability cannot support her claims against Prime because there are simply no factual allegations supporting any such theory. (Def. Mov. Br. at 4).  In opposition, Galarza maintains that she pleaded sufficient facts to support that Prime was a joint employer.  (Pl. Opp. Br. at 7-10).

### III.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Determining whether there is "a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

"When reviewing a motion to dismiss, '[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom.'"  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)).  But the court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

So, the inquiry is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the

well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus*, 641 F.3d at 563.

Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." (internal quotation marks, textual modifications and citations omitted)).

## IV.   Discussion

### A. The Court cannot dismiss successor-liability claims against Prime at this time.

"A bankruptcy trustee may sell property 'free and clear of any interest in such property . . . .'" *Molla v. Adamar of N.J., Inc.*, No. 11-6470, 2014 WL 2114848, at *3 (D.N.J. May 21, 2014) (quoting 11 U.S.C. § 363(f)).  In *In re Trans World Airlines, Inc.*, the Court of Appeals for the Third Circuit reviewed a bankruptcy court order that approved the sale of the assets of Trans World Airlines ("TWA") to American Airlines.  322 F.3d 283, 284-85 (3d Cir. 2003).  It ruled that: "Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property[,]' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability" against American Airlines.  *Id.* at 285 (alterations in original).

Here, as detailed above, the Bankruptcy Court's November 13 order mandates that Prime's purchase of the facility where Galarza worked be free and clear of all claims and

interests pursuant to § 363(f).   (*See* Nov. 13 Bankruptcy Court Order at 7-9, 11-13).   In particular, the Bankruptcy Court's November 13 order states that: "all of the Debtors' right, title and interest in and to the Assets shall pass to Purchaser pursuant to section 363(f) of the Bankruptcy Code and all other applicable laws free and clear of any and all . . . successor liability . . . *whether arising prior to, on, or subsequent to August 10, 2015*."   (*Id.* at 11-12 (emphasis added)).   Accordingly, it would seem that the Bankruptcy Court's November 13 order, 11 U.S.C. § 363(f), and the *In re Trans World Airlines* case are clear: Prime's purchase of the facility where Galarza worked was free and clear of all claims, interests, and encumbrances including those claims, such as Galarza's, which arose after St. Michael's filed for bankruptcy. *See Molla*, 2014 WL 2114848, at *5.

But the problem for Prime is that its very own cited case law indicates that there are exceptions under which successor liability attaches—some of which are relevant here and unaddressed in Prime's briefing.  (*See* Def. Mov. Br. at 19-23; Def. Reply Br. at 4-5 (citing *Dinielli v. Tropicana Hotel & Casino*, No. A-2869-12T4, 2014 WL 87671 (N.J. Super. Ct. App. Div. Jan 10, 2014); *Douglas v. Stamco*, 363 F. App'x 100 (2d Cir. 2010))).  The exceptions are: (1) the successor expressly or impliedly assumes the liabilities; (2) there is an actual or *de facto* consolidation or merger of the two companies; (3) the purchaser is a mere continuation of the seller; or (4) the transaction was entered into fraudulently to escape liability.  *See Dinielli*, 2014 WL 87671, at *3; *Douglas*, 363 F. App'x at 101-02; *see also Molla*, 2014 WL 2114848, at *4 (discussing *Dinielli* and the four exceptions).  Indeed, Galarza notes these four exceptions in her opposition brief and, in particular, the prospect that Prime and St. Michael's consolidated or merged and that Prime is a mere continuation of St. Michael's.  (*See* Pl. Opp. Br. at 13 (citing allegations from the Complaint)).

But Prime does not offer a response in its reply brief to Galarza's contention that these two exceptions apply.[5]  Indeed, the allegations in paragraphs 109a to 109j—which Galarza directs the Court to (*see* Pl. Opp. Br. at 13)—are as follows:

> 109a. In May 2016, Defendant Prime-St. Michael's finalized its merger with or purchase of St. Michael's.

> 109b. Prime-St. Michael's had notice of Plaintiff's lawsuit prior to acquiring the business or assets of St. Michael's.

> 109c. There has been a substantial continuity of business operations since Prime-St. Michael's purchase of St. Michael's.

> 109d. Prime-St. Michael's uses the same facility at the same address that St. Michael's used prior to the purchase.

> 109e. Prime-St. Michael's uses substantially the same workforce that St. Michael's used prior to the purchase.

> 109f. Prime-St. Michael's uses the same or substantially the same supervisory personnel that St. Michael's used prior to the purchase.

> 109g. The same jobs exist under substantially the same working conditions at Prime-St. Michael's as they did at St. Michael's prior to the purchase.

> 109h. Prime-St. Michael's uses the same machinery, equipment, and methods of services and provides the same services that were provided at St. Michael's prior to the purchase.

> 109i. Prime-St. Michael's is liable for retaliation under the FMLA and LAD because it was operating St. Michael's at the time some or all of the discrimination, harassment and retaliation occurred.

> 109j. Prime-St. Michael's is also liable for retaliation under the FMLA and LAD, and violations of the FLSA and NJWHL pursuant to the doctrine of successor-liability.

---

[5]     To be sure, Galarza argues that "the facts suggest that the purchase and specifically the timing of Plaintiff's termination and the purchase were undertaken fraudulently or to avoid liability."  (Pl. Opp. Br. at 13).  Prime *does* respond to that contention.  (*See* Def. Reply Br. at 6 ("Plaintiff cannot credibly contend that Prime Healthcare's asset purchase was conceived solely to avoid liability to her frivolous wrongful termination claim.")).  This is neither here nor there, however, because the Court's concern is over the two other exceptions—i.e., consolidation or merger and/or a mere continuation.

So, the Court must accept as true the factual allegations regarding, among other things, the facility, the address, the workforce, the supervisory personnel, the equipment, and the offered services. And Prime's briefing—namely, its reply brief—simply doesn't provide the Court a reason for why it is improper to draw a reasonable inference that there was consolidation or merger of St. Michael's and Prime and/or that the Prime is a mere continuation of St. Michael's. In other words, Prime addresses the fraud exception, and it appears that the sum and substance of Prime's motion to dismiss concerns the first exception—i.e., that as a purchaser Prime has not expressly or impliedly assumed St. Michael's liabilities. But the Court is left without any arguments concerning the second or third exceptions. *Cf. Douglas*, 363 F. App'x at 102 (noting that the "parties appear to agree that neither the first nor the fourth exception applies" and analyzing the "two remaining exceptions").[6]

The Court declines to sua sponte address whether these exceptions apply here; after all, it is Prime's motion to dismiss. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) ("The defendant bears the burden of showing that no claim has been presented.").[7] Accordingly,

---

[6]    At most, Prime states in its reply brief that, "[a]s discussed at length [in its reply brief] and in [Prime's] moving brief, Bankruptcy Code Section 363 obviates the need to evaluate the fact-specific elements for establishing successor liability." (Def. Reply Br. at 6). But it is unclear whether Prime is arguing that the Court need not consider the exceptions. If that is Prime's argument, Prime has failed to provide a basis for setting aside exceptions that are discussed in its very own cited case law.

[7]    *Cf. Grieco v. Lanigan*, No. 15-7881, 2016 WL 3450808, at *6 (D.N.J. June 17, 2016) ("In their reply briefs, the Moving Defendants attempt to clarify their arguments and contend that Plaintiff's NJTCA claims for negligent supervision/training are conclusory under *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2008). Although Defendants contend that Plaintiff's Complaint, which was initially filed in state court, fails to meet the federal pleading requirements, the reply papers do not provide the Court with the elements of a claim for negligent supervision/training and states instead that Plaintiff has not provided 'specific facts demonstrating an actionable claim of failure to train or supervise[.]' Without appropriate briefing, the Court declines to determine whether Plaintiff's Complaint states claims for relief against each Moving Defendants under the NJTCA based on a theory of failure to supervise/train.") (citations omitted) (alteration in original); *Ford v. Cty. of Mercer*, No. 14-0648, 2016 WL 781877, at *9 (D.N.J. Feb. 29, 2016) ("The Court also declines to dismiss the *Monell* claim based on failure to train because the County Defendants have not carried their burden to show that Plaintiffs fail to state a claim for relief based on either a pattern of violations or a single incident theory of liability. In its reply brief, the County Defendants argue that *Connick* does not permit a failure to train based on the 'single incident' of housing Defendant Gaines and Boones together, and that *Connick* permits 'single incident' failure to train claims only in situations

the Court must deny Prime's motion to dismiss successor-liability claims *without prejudice* to Prime raising its arguments in future motion practice.

**B. Prime's motion fails to show that Galarza's allegations cannot support a joint-employer theory of liability.**

**1. The FLSA (Count IV) & the NJWHL (Count V)**

"A 'single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA]. . . . A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case.'" *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig. ("Enterprise")*, 683 F.3d 462, 467 (3d Cir. 2012) (quoting 29 C.F.R. § 791.2(a)) (alteration in original). "When faced with a question requiring examination of a potential joint employment relationship," the Court must consider:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*Id.* at 469.

But "these factors *do not constitute an exhaustive list* of all potentially relevant facts, and should not be blindly applied." *Id.* (emphasis in original) (quotation marks and citation omitted). "A determination as to whether a defendant is a joint employer must be based on a consideration of the total employment situation and the economic realities of the work relationship." *Id.* (citation and quotation marks omitted). Indeed, "[i]f a court concludes that other indicia of

where the failure to train is 'patently obvious' (ECF No. 54, Reply at 6), but provide no further analysis of the facts alleged in the Amended Complaint.").

'significant control' are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive, when incorporated with the individual factors" set forth above. *Id.* at 470.

"Courts have found the definitions for 'employer' and 'employee' under the FLSA and NJWHL to be virtually identical, and have applied the Third Circuit's test in *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.* . . . to both statutes." *Wang v. Saker Shoprites, Inc.*, No. 16-2443, 2017 WL 380911, at *3 (D.N.J. Jan. 26, 2017) (cleaned up) (citing 683 F.3d 462, 467-68 (3d Cir. 2012)) (collecting cases).

Here, Galarza directs the Court to the following allegations, arguing that she has alleged sufficient facts to support that Prime was a joint employer with St. Michael's (*see* Pl. Opp. Br. at 7-10):

> 6a. Defendant Prima Healthcare Services – St. Michael's, LLC (hereinafter referred to as "Prime-St. Michael's") is a Corporation registered in the State of New Jersey with its principal place of business at 111 Central Avenue, Newark, NJ 07102.
>
> 6b. Defendant Prime-St. Michael's originally registered with the State of New Jersey as a business operating at that address on June 28, 2013.
> ….
>
> 74b. Despite St. Michael's filing for bankruptcy the facility continued to operate.
>
> 74c. Prime-St. Michael's continued to operate the facility by itself or in conjunction with St. Mary's in 2015 and continues to today.
> ….
>
> 109l. Prior to Plaintiff's termination from St. Michael's, Prime-St. Michael's and its employees took over control of operating St. Michael's.
>
> 109m. At the time Plaintiff was terminated from her employment with St. Michael's and for a period of time before that Prime-St.

Michael's and its employees exercised significant control over Plaintiff as an employee of St. Michael's.

109n. At the time Plaintiff was terminated from her employment with St. Michael's and for a period of time before that Prime-St. Michael's and its employees had authority to hire and fire employees of St. Michael's, promulgate work rules and assignments, and set conditions of employment including compensation, benefits and hours.

109o. At the time Plaintiff was terminated from her employment with St. Michael's and for a period of time before that Prime-St. Michael's and its employees had authority to supervise employees on a day-to-day basis, including disciplining and terminating employees of St. Michael's.

109p. At the time Plaintiff was terminated from her employment with St. Michael's and for a period of time before that Prime-St. Michael's and its employees had control over St. Michael's employee personnel records including but not limited to payroll, insurance, and taxes.

As an initial matter, the Court finds unpersuasive at best Prime's contention that the Complaint "is completely devoid of any allegations as to the who, what, when, where, why and how in support of Plaintiff's claims." (*See* Def. Reply Br. at 11). It is well settled in the Third Circuit that a "plaintiff alleging *fraud* must . . . support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)) (emphasis added); *see also United States v. Eastwick College*, 657 F. App'x 89, 93 (3d Cir. 2016) ("In order to satisfy Rule 9(b), a complaint must provide all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue.") (citation and quotation marks omitted) (emphasis added). Here, no asserted cause of

action is one of fraud or mistake.  Rule 9(b) is simply not at issue; the sufficiency of pleading under Rule 8(a) is.  *See Twombly*, 550 U.S. at 555 ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . . [A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . .") (internal citations and quotation marks omitted).

To that end, the Court finds that there are sufficient factual allegations at this juncture from which the Court can draw reasonable inferences supporting a joint-employer theory of liability.  The Court must accept as true that Prime and St. Michael's have been operating out of the same address since 2013.  (*See* Compl. ¶¶ 6a, 6b, 109d).  In addition, the Court must accept as true that Galarza was told that "St. Michael's filed for Chapter 11 bankruptcy on August 10, 2015," but that she was terminated on or after October 13, 2015.  (*Id.* ¶¶ 74-82; *see also* Nov. 13 Bankruptcy Court Order at 12).  Also accepted as true is that, despite the bankruptcy petition, the facility continued to operate and, in fact, "Prime-St. Michael's continued to operate the facility by itself or in conjunction with St. Mary's in 2015 and continues to today."  (*Id.* ¶¶ 74b-74c).  Further, the Court must accept that, before and at the time of Galarza's termination, Prime and its employees "had authority to hire and fire employees of St. Michael's, promulgate work rules and assignments, and set conditions of employment including compensation, benefits and hours." (*Id.* ¶ 109n).  Likewise, before and at the time of her termination, Prime and its employees "had authority to supervise employees on a day-to-day basis, including disciplining and terminating employees of St. Michael's."  (*Id.* ¶ 109o).  Further, before and at the time of her termination, Prime and its employees "had control over St. Michael's employee personnel records including but not limited to payroll, insurance, and taxes."  (*Id.* ¶ 109p).

Prime seems to argue that Galarza's allegations fall short because she doesn't allege "how" Prime exercised control over *her* employment, "including her discharge, pay, or any of the purported discriminatory conduct alleged" in her Complaint.  (Def. Mov. Br. at 28*; see also* Def. Reply Br. at 10 ("Plaintiff alleges no facts whatsoever to explain *how* [Prime] exerted any control over *her* employment.") (emphasis added); *see also id.* at 11 ("Plaintiff does not allege exactly how – more than 9 months before the Asset Purchase Agreement was finalized – [Prime] asserted any control over Plaintiff's employment.")).  Simply put, Prime contends that Galarza must allege facts concerning "how" Prime exerted control over *her* employment.

But Galarza "must be given the benefit of every favorable inference."  *See Malleus*, 641 F.3d at 563.  And the Court can reasonably infer that Prime exerted control over Galarza—just like over any other employee at the facility—by the following allegations cited above: Prime was operating out of the same address as St. Michael's using "St. Michael's" in its name (i.e., "Prime-St. Michael's") since 2013; before and after the bankruptcy Petition, Galarza was working at the facility in 2015; the operation of the facility that Galarza worked at was never interrupted; and Prime has been operating that facility by itself or with St. Michael's since 2015. Further, when Galarza was working at the facility, Prime and its employees could: hire and fire employees, set rules and assignments, set compensation, benefits and hours for them; supervise them on a day-to-day basis, including being able to impose discipline and terminate them; and had control over their personnel records, including information concerning payroll, insurance, and taxes.  Finally, the following timeframe is relevant for the Court:  Galarza was working at St. Michael's; Prime has been operating out of the same address as St. Michael's since 2013; St. Michael's filed for bankruptcy in August 2015; Prime continued to operate the facility; and, after returning to work from a medical leave in October 2015, she was terminated.

Galarza has alleged enough relating to the *Enterprise* factors and, as far as the Court can tell, Prime doesn't cite any cases from this District suggesting more is required.  (*See* Def. Reply Br. at 10).  Indeed, the *Wang* decision—which Prime cites—turned on (1) a plaintiff's reliance on two paragraphs that "do not respond to any of the *Enterprise* test's four factors" and (2) plaintiff's reliance on three other paragraphs that—unlike Galarza's Complaint—had the phrase "upon information and belief."  *See* 2017 WL 380911, at *4-5.  For the same reasons, the Court finds unavailing Prime's argument that her allegations aren't facts, but rather "cut-and-paste allegations mirroring the requisite legal elements."  (*See* Def. Mov. Br. at 29).  Prime simply provides no case law that demands the level of specificity it seeks—i.e., allegations about attending meetings with Prime employees, receipt of emails from Prime before termination, interactions "with anyone at [Prime]," and awareness "of any specific actions" by Prime regarding its role "in her termination."  (*See* Def. Reply Br. at 11-12).

Having employed judicial experience and common sense and, further, having given Galarza the benefit of every favorable inference to be drawn in light of the totality of the allegations, the Court must deny Prime's motion to dismiss Galarza's FLSA and NJWHL claims *without prejudice* to Prime raising its arguments in future motion practice.

## 2.  The LAD (Count I) & the FMLA (Count III)

"[T]he NJLAD generally require[s] an employment relationship to exist between a plaintiff and a defendant to hold said defendant liable for acts of discrimination."  *Plaso v. IJKG, LLC*, No. 11-5010, 2013 WL 2182233, at *3 (D.N.J. May 14, 2013), *aff'd*, 553 F. App'x 199 (3d Cir. 2014).  "Generally, an employment relationship exists when defendant is either plaintiff's (1) employer or (2) joint employer."  *Id.*; *see also Alston v. Monmouth Cty. Prosecutor's Office*, No. 12-5633, 2014 WL 1095716, at *8 (D.N.J. Mar. 19, 2014) ("New Jersey courts have held

that where a traditional employment relationship is lacking, a person may be deemed to be jointly employed by two entities for the purposes of the LAD.") (collecting cases).

And to determine whether a person is "jointly employed" for the LAD, the courts consider the following twelve factors:

> [(1)] the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation-supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the 'employer'; (10) whether the worker accrues retirement benefits; (11) whether the 'employer' pays social security taxes; and (12) the intention of the parties.

*Alston*, 2014 WL 1095716, at *8 (quoting *Thomas v. Cty. of Camden*, 902 A.2d 327, 334-35 (N.J. Super. Ct. App. Div. 2006)); *see also Plaso*, 2013 WL 2182233, at *6, *6 n.7 (stating that, for LAD, courts apply this twelve-factor test set forth in *Pukowsky v. Caruso*, 711 A.2d 398, 404 (N.J. Super. Ct. App. Div. 1998) to determine whether an employer-employee relationship exists between plaintiff and defendant); *Chen v. Domino's Pizza, Inc.*, No. 09-0107, 2009 WL 3379946, at *4 (D.N.J. Oct. 16, 2009) (same).

Here, the Court finds that its analysis in connection with Galarza's FLSA and NJWHL claims applies to her LAD claim in this context and, therefore, must deny Prime's motion to dismiss the LAD claim *without prejudice* to Prime raising its arguments in future motion practice. *Cf. Plaso*, 553 F. App'x at 205 n.4 ("Plaso contends that the District Court's succinct treatment of her NJLAD claim glossed over the multi-factored test for employment set forth by *Pukowsky v. Caruso*, 312 N.J. Super. 171, 711 A.2d 398, 404 (App. Div. 1998). We do not find that a 'principled application' of *Pukowsky* would yield a different outcome."). Indeed, in its reply brief, Prime appears to address all of Galarza's claims (which rely on a joint-employer

theory of liability) together.  (*See* Def. Reply Br. at 6-12).  Moreover, Prime's cited cases in support of dismissing Galarza's LAD claim are New Jersey federal court decisions that resolve summary-judgment motions (*see* Def. Mov. Br. at 25 n.10, 27 n.11); Prime doesn't cite any cases from this District convincing this Court that dismissal is appropriate in this context.

Likewise, the Court finds that Galarza's FMLA claim must survive.  "FMLA liability requires a showing that a defendant is an employer subject to the requirements of the statute." *Amoroso v. Bucks Cty. Court of Common Pleas*, No. 13-0689, 2014 WL 1284791, at *10 (E.D. Pa. Mar. 27, 2014) (citation omitted).  "To prove that multiple entities constitute a single employer subject to FMLA, [Galarza] may utilize . . . the 'joint employment test.'"  *Kieffer v. CPR Restoration & Cleaning Serv., LLC*, 200 F. Supp. 3d 520, 529 (E.D. Pa. Aug. 3, 2016) (citing 29 C.F.R. § 825.104(c)(1)).  In turn, "the joint employment test" is "discussed in § 825.106."  29 C.F.R. § 825.104(c)(1).

Section 825.106(a) provides that:

> Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers, and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
>       (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
>
>       (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,
>
>       (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one

employer controls, is controlled by, or is under common control with the other employer.

Again, the Court finds that its analysis in connection with Galarza's FLSA and NJWHL claims applies with equal force to her FMLA claim in this context and, therefore, must deny Prime's motion to dismiss the FMLA claim *without prejudice* to Prime raising its arguments in future motion practice.  Again, Prime's cited cases in support of dismissing Galarza's FMLA claim are ones in this District that resolve summary-judgment motions; Prime doesn't cite any cases from this District—or even this Circuit—convincing this Court that dismissal is appropriate in this context. (*See* Def. Mov. Br. at 31-32).[8]

## IV.    Conclusion

For the reasons above, the Court denies Prime's motion to dismiss pursuant to Rule 12(b)(6) *without prejudice* to its ability to raise any of its arguments in future motion practice.[9] An appropriate Order accompanies this Opinion.

<u>s/Esther Salas</u>
**Esther Salas, U.S.D.J.**

---

[8]      Prime's argument at the end of its moving brief—which cites no case law from this Circuit—appears to simply repackage its contentions that neither alleged theory of liability (i.e., successor liability and joint employer) applies here.  (*See* Def. Mov. Br. at 32-35).

[9]      The Court need not convert Prime's motion into one for summary judgment.  (*See* Pl. Opp. Br. at 13-14; Def. Reply Br. at 12-15).  As Prime itself states, "the Court need not consider the Asset Purchase Agreement" and its motion "is based on the Bankruptcy Court's sale order and Bankruptcy Code Section 363."  (Def. Reply Br. at 14).